UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY TUCK,

       Plaintiff,

v.

OFFICER JEFFREY NIEHAUS AND SGT.
GARY HAMLIN,

       Defendants.

_____/

Case No. 09-11240

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [22]**

This action, alleging Fourth Amendment violations and supervisory liability is brought

pursuant to 42 U.S.C. § 1983 and arises from events that occurred at Plaintiff's home on

Saturday, March 15, 2008.  Plaintiff alleges that Defendants violated his Fourth Amendment

rights by using excessive force on him and by charging and prosecuting him without

probable cause.  This matter is now before the Court on Defendants' motion for summary

judgment arguing that Defendants are entitled to qualified immunity on Plaintiff's Fourth

Amendment claims and that Plaintiff cannot assert a claim of supervisory liability against

Defendant Hamlin.  As discussed more fully below, Defendants' motion for summary

judgment is GRANTED only as to Plaintiff's § 1983 claim of excessive force against

Defendant Hamlin.  As to all remaining claims, Defendants' motion is DENIED.

**I.     Facts**

The facts are in dispute.

### A. Defendant Officer Niehaus

Officer Niehaus's testimony comes from his deposition and affidavit. (Pl.'s Ex. 5, Niehaus Dep.; Defs.' Ex. 4, Niehaus Aff.) On March 15, 2008, he responded to a call about a suspicious person/vehicle from a group home in the area where Plaintiff resides. (Niehaus Aff. ¶¶ 2-3.) Officer Niehaus was alone in his squad car. Another officer, Officer Kossik, also responded in his squad car and had stopped a vehicle on a side street. Officer Niehaus, coming from the opposite direction, pulled up to the driver's side window of Officer Kossik's vehicle and was conversing with him when he noticed a small silver-colored vehicle drive by, turn around, and drive by again. Finding this conduct suspicious, Officer Niehaus followed the vehicle, ultimately parking behind it on the street. (*Id.* at ¶¶ 6-11; Niehaus Dep. at 12-23.) The vehicle stopped in front of Plaintiff's home. The car contained four young males and was driven by Tommy Jackson. Plaintiff's son Michael was a passenger in the car. They were returning from a video game tournament at a University of Michigan college dorm in Ann Arbor, Michigan. (Pl.'s Ex. 2, Jackson Dep. at 6, 10-13.) Officer Niehaus avers that Jackson turned off his car's lights before coming to a complete stop. (Niehaus Aff. ¶ 12.) Jackson denies this. (Jackson Dep. at 13.)

Officer Niehaus further avers that, after he shined his spotlight on the silver car, all four occupants exited very quickly. A passenger, Michael Tuck, approached him in a confrontational manner, asking, "What's the problem, why are you following us?" (Niehaus Aff. ¶¶ 13-14.) Officer Niehaus explained about the call from the group home and that their presence in the area raised suspicion. Michael denied any involvement and told Officer Niehaus to get off his property, using profanity. Michael also gave the officer his name and told him that this was his home. Officer Niehaus asked Michael for his I.D., and he

2

responded, using profanity, that he did not have it on him and did not need to show it to Officer Niehaus.  He also motioned to his friends in the direction of his house.  Officer Niehaus took this as a signal that Michael was not going to cooperate, causing him to become more suspicious of Michael. (Niehaus Aff. ¶¶ 15-22.) Officer Niehaus "requested" that Michael sit in his squad car so he could verify his identity.  He also warned Michael that he would be arrested if he continued with his loud profanity. Michael responded with profanity.  (*Id.* at ¶¶ 23-24.)

At that point, Officer Niehaus avers that he then became engaged with the driver of the car, Tommy Jackson. Jackson began yelling at him, repeatedly swearing, and accusing Officer Niehaus of harassing the young men.  Officer Niehaus informed Tommy Jackson that if he did not stop swearing, he would be arrested.  (*Id.* at ¶¶ 26-27.)  Officer Niehaus admits that he was within a couple of feet from Tommy Jackson and they were "having a heated argument."  He also admits swearing at Tommy, telling him that he did not have to tell him anything, and telling him not to talk. (Niehaus Dep. at 25, 35.)  Officer Niehaus also admits that he swore at Michael Tuck.  (Niehaus Dep. at 34-35, 46.)

At this point, Michael Tuck yelled for his father, Plaintiff Terry Tuck.  (Niehaus Aff. at ¶ 29.)  Plaintiff then came out of the front door, "running into the front yard."  (*Id.* at ¶ 29.) Plaintiff told his son and Tommy to show some respect for the police.  Officer Niehaus tried to explain to Plaintiff what was going on, but Michael kept interjecting, yelling and swearing. (*Id.* at ¶¶ 30-31.)  "Because Michael kept swearing," and his father "could not get him to calm down and cooperate," Officer Niehaus walked toward Michael and told him that he was going to jail.  Plaintiff then approached Officer Niehaus and said, "He's not going to jail."  Officer Niehaus then repeated that Michael was going to jail.  (*Id.* at ¶¶ 32-33.)

3

Plaintiff continued to approach Officer Niehaus and "pushed [him] in the chest with both hands." (*Id.* at ¶ 34.) Officer Niehaus "then turned to [Plaintiff] and informed him that he was going to jail," and Plaintiff responded with profanity and said he was not going willingly. (*Id.* at 35.) Officer Niehaus attempted to grab Plaintiff's arm, reaching for his upper arm, but caught his shirt at the neckline. Plaintiff pulled away, and his shirt ripped down the front. Plaintiff then motioned for his son and the three other young men to go into the house. Plaintiff went in the house also. (*Id.* at ¶¶ 36-38; Niehaus Dep. at 43-44, 52-54.)

Officer Niehaus called dispatch and requested assistance. Before assistance arrived, Plaintiff opened windows and yelled and screamed profanity at him from inside. After they arrived, Officer Kossik and Sergeant Hamlin witnessed this behavior. (Niehaus Aff. ¶¶ 39-42.) Officer Niehaus admits, while Plaintiff was in the house and there was yelling out the window, he responded, "come out and get arrested like a man." (Niehaus Dep. at 42.) He believes Sergeant Hamlin was present when he said this. (*Id.* at 43.) Officer Niehaus did not believe that he was out of control at any time. (*Id.* at 50.)

The police left Plaintiff's home. In his report, Officer Niehaus requested "a warrant for assault on a police officer" against Plaintiff. (Defs.' Ex. 2, 3/16/08 Wixom PD Crime Report.)

### B. Defendant Sergeant Hamlin

Sergeant Hamlin's testimony comes from his deposition and affidavit. (Pl.'s Ex. 4, Hamlin Dep.; Defs.' Ex. 12, Hamlin Aff.) It is not disputed that Sergeant Hamlin arrived on the scene after the altercation between Plaintiff and Officer Niehaus occurred and Plaintiff was in his home.

4

Sergeant Hamlin went to Plaintiff's home in response to Officer Niehaus's radio request and was the officer in charge.  (Hamlin Dep. at 5, 20.)  When he arrived, Officers Niehaus and Kossik were on Plaintiff's front deck.  He observed Plaintiff and his son yelling out a window that faced the deck.   They were yelling profanities and threatening to physically injure the officers.  (Hamlin Aff. ¶¶ 7-10.)  At his deposition, Sergeant Hamlin testified that he heard profanities being screamed back and forth between Officer Niehaus and Plaintiff and his son.   Sergeant Hamlin denies that he took part in this exchange. (Hamlin Dep. at 17-18, 19, 21-22, 28-29, 35-36.)  Officer Niehaus told him that Plaintiff's son had approached him in a confrontational manner, resisted his request for identification with profanity, and resisted rather than cooperated with him.  Officer Niehaus also told Hamlin that he told Plaintiff that his son was going to be arrested and that Plaintiff placed himself between his son and the Officer, shoved Officer Niehaus, and prevented him from arresting his son.  (Hamlin Aff. ¶¶ 14-17.)  Sergeant Hamlin asked Plaintiff why he would shove a police officer, and Plaintiff responded that he thought Officer Niehaus was going to "strike" his son with a flashlight.  Hamlin examined and saw that Officer Niehaus had a seven-inch flashlight.  (*Id.* at ¶¶ 18-19.)  When Plaintiff did not come out of the house, Sergeant Hamlin directed the officers to leave the scene and seek a warrant for his arrest. (*Id.* at ¶ 20.)  Officer Kossik also avers that Sergeant Hamlin directed that he and Officer Niehaus seek a warrant for Plaintiff's arrest.  (Defs.' Ex. 3, Kossik Aff. ¶ 12.)  Sergeant Hamlin admitted that it was his idea to take a photograph of a seven inch flashlight in between a banana and a coffee cup.  (Hamlin Dep. at 33-34.)  That photograph was subsequently introduced at Plaintiff's one-day trial where he was acquitted of charges brought against him.

5

**C. Plaintiff Terry Tuck**

   **1. Events Occurring Before Plaintiff Exits His Home and Gets Involved**

On Saturday, March 15, 2008, Plaintiff's son Michael and his friends, Tommy Jackson, Devon DeFranceso and Andrew DeFranceso, were returning to his house from Ann Arbor. Tommy was driving. When he attempted to go through the neighborhood to Plaintiff's home, he saw that the street was blocked by two police cars and a civilian car. He drove into the driveway of a nearby home, backed out, and proceeded to drive around the block another way. Tommy parked his car in front of Plaintiff's home. (Pl.'s Ex. 2, T. Jackson Dep. at 6, 10-13.) As the four boys were getting out of Tommy's car, Office Niehaus pulled up behind Tommy's car. Tommy and Plaintiff's son approached the officer. Both boys approached Officer Niehaus; Tommy because he was the driver and Plaintiff's son because they were at his home. Officer Niehaus got out of his car. Tommy asked what was going on, but the officer did not respond. Then, Officer Niehaus asked Tommy for his identification. Tommy pulled his license out, but Officer Niehaus never looked at it. (T. Jackson Dep. at 13-16.) When Officer Niehaus asked Plaintiff's son for his identification, Michael did not produce it and asked him why he needed it. Michael explained that he did not have it on him but that he could go into his house and get it or wake his parents up and prove that he lived there. Tommy testified that Officer Niehaus responded by yelling and swearing at Michael, calling him a "little fucker." (*Id.* at 16-18.) Officer Niehaus and Michael got loud, exchanging profanities. Tommy politely asked Officer Niehaus for his name and badge number multiple times because things were getting out of hand. Officer Niehaus did not comply. He responded, "I don't have to give you shit. I don't have to tell you shit. I do what I want." Officer Niehaus was screaming in Tommy's face. Tommy

6

described this as the climax of the entire incident.  He and Officer Niehaus were nose to nose.  Officer Niehaus was spitting in Tommy's face as he repeatedly screamed at him, "Why are you talking?"  Officer Niehaus called the boys "little shits," and called Michael a "little fucker."  (T. Jackson Dep. 20-24, 30-31, 34, 45, 46.)  At his deposition, Tommy described the scene as follows:

> [H]e came into my face just unnecessarily.  Just -- I don't know what hit the wrong button, he snapped and just was screaming in my face.
>
> I've never been talked to like that.  Like it was a drill sergeant.  Like I had just signed up for the marines and I had done something terrible, and I had a drill sergeant screaming in my face when all I did was ask for a badge number.

(*Id.* at 30-31.)

### 2. Plaintiff Becomes Involved

Plaintiff was in his home up until this time, unaware of what was happening outside.  He did not realize that anyone was outside until he got up to got to bed and walked by his front door.  The dog was whining and barking at the door.  When he got close to the door, he could hear yelling outside.  When he opened the door, he saw Officer Niehaus basically nose to nose with Tommy Jackson, screaming obscenities at him.  Plaintiff yelled to Officer Niehaus to calm down.  Office Niehaus did not acknowledge him and likely did not hear him.  Plaintiff did not know what was going on, so he started to come off the front deck of his home.  When he got about halfway down the deck, Officer Niehaus was still swearing at Tommy.  Plaintiff then yelled louder at Officer Niehaus, telling him to calm down.  Officer Niehaus then looked toward Plaintiff, saw his son Michael, and began yelling at Michael.  (Pl.'s Ex. 1, Pl.'s Dep. at 18-19.)

7

When he first came out of the house, Plaintiff did not realize that his son was out there because he was up by the home's landscaping. At that time, his son was probably 45 feet away from Officer Niehaus. (*Id.* at 5-7, 16.) Plaintiff realized his son was outside when he heard Officer Niehaus yelling at his son to get in the fucking car. Plaintiff had no idea why Officer Niehaus was yelling that. (*Id.* at 16-20.) Officer Niehaus and Plaintiff's son were swearing at each other. Plaintiff came off the front deck of his home and went towards his son, telling his son not to talk to the Officer like that and telling the Officer to calm down. Plaintiff asked Officer Niehaus what was going on, but he never got an answer. Both the Officer and Michael continued swearing at each other with Officer Niehaus telling Michael to get in the fucking car and Michael responding that he wasn't getting in his fucking car. Then Officer Niehaus started after Michael. (*Id.* at 18-21, 28.)

At first, Officer Niehaus stumbled in the snow by the road, regained his footing, and then charged or ran towards Michael with his flashlight raised over his head. He was yelling "I'm going to kill that fucker." It appeared to Plaintiff that Officer Niehaus wanted to harm his son. (*Id.* at 21-28, 59-62.) Plaintiff testified that:

> It was very obvious that the officer had lost his temper. He was swearing. You know, every other word out of his mouth was a swear word, spit flying everywhere. And when he went after Mike, he went after Mike with aggression.

(*Id.* at 60-61.) Officer Niehaus did not say anything about taking Michael to jail or arresting him in Plaintiff's presence. (*Id.* at 22-23, 25.)

Officer Niehaus got as far as Plaintiff, who was standing at that time between his son and Officer Niehaus. Plaintiff held his hands up in a gesture of submission or surrender and said, "Calm down." Officer Niehaus continued to run at Michael but then stumbled. When he regained his footing, he focused on Plaintiff and ran right into him, knocking him

8

backwards into Michael, and then grabbed and ripped his shirt.  Plaintiff went down on one knee, stood up, and then Officer Niehaus pointed to him and said, "You're going to jail, you assaulted an officer."  Plaintiff stood up, looked down, saw that his shirt was ripped, and said, "It looks like I got assaulted."  Plaintiff presents evidence of bruises and scratches from Officer Niehaus.  (Pl.'s Dep. Exs. 3-6, photographs.)  Plaintiff then went into the house with the four boys.  (*Id.* at 21-30, 59-62.)

Officer Niehaus radioed for backup.  (Pl.'s Dep. at 30.)  After Plaintiff and the boys were inside, Sergeant Hamlin arrived and spoke with Officer Niehaus.  (*Id.* at 30-33.) Officer Kossik arrived second.  Sergeant Hamlin went up on the front deck of Plaintiff's home, Plaintiff lowered a window, and Sergeant Hamlin told Plaintiff to "get his pussy ass out there and go to jail like a man."  He would not tell Plaintiff why he was going to jail, and Plaintiff told him that he had not done anything wrong and that Officer Niehaus was out of control.  Sergeant Hamlin and Officer Niehaus, who was also on Plaintiff's front deck, continued cussing and swearing at him.  (*Id.* at 33-34.)  Plaintiff denies that he swore or cussed back at them.  Defendant Officers were so loud that a next door neighbor, Brian Murray, heard them swearing.  He did not hear Plaintiff responding with profanity.  He heard the officers saying things like "C'mon you motherfucking pussy, come out of the house," and something like, "I'm going to kick your ass."  (Pl.'s Ex. 3, Murray Dep. 12-13, 16, 19-22).  Eventually, the officers left.  After they left, Plaintiff called the State Police to complain.  (Pl.'s Dep. at 36-37.)  Then, he called City Hall and spoke with Sergeant Hamlin, telling him that he wanted to make a complaint about Officer Niehaus.  Sergeant Hamlin told Plaintiff, "Your kid's a dumb ass," and called Plaintiff "a dumb fucking hillbilly" and hung up on him.  (*Id.* at 37-38.)

9

### D. Criminal Charges Filed Against Plaintiff and Acquittal at Trial

Misdemeanor criminal charges were filed against Plaintiff and his son for resisting, obstructing, and hindering a police officer in the performance of his duty, in violation of the City of Wixom's Criminal Code § 9.08.010, titled "Interference with police department and related offenses." Section 9.08.010 provides in relevant part that:

> A. No person shall resist any police officer, any member of the police department or any person duly empowered with police authority while in the discharge or apparent discharge of his duty, or in any way interfere with or hinder him in the discharge of his duty.

> B. No person shall offer or endeavor to assist any person in custody of a police officer, a member of the police department, or a person duly empowered with police authority, to escape or attempt to escape from such custody.

(Defs.' Ex. 15, Wixom Ordinance § 9.08.010.)  Plaintiff and his son hired an attorney.  They were arraigned on the charges brought against them in 52-1st District Court, and on August 21, 2008, a jury trial was held in the Novi District Court.  (Compl. at ¶¶ 45-46, 53-55.) Sergeant Hamlin testified at the trial.  During his testimony, the photograph he took of a banana, a flashlight, and a coffee cup was introduced into evidence.  (*Id.* at ¶ 49-52.) Plaintiff and Tommy Jackson testified that this was not the flashlight Officer Niehaus used during the March 15, 2008 incident.  The flashlight he used was described as much larger. (Pl.'s Dep. at 60-61, T. Jackson Dep. at 48-49.)  The jury unanimously found Plaintiff and his son not guilty.  (Compl. at ¶ 55.)

Plaintiff subsequently filed this complaint asserting § 1983 claims and alleging that Defendants violated his Fourth Amendment rights when they arrested and prosecuted him without probable cause and alleging a claim of supervisory liability against Sergeant

Hamlin.[1]  Specifically, in Count I, Plaintiff alleges that Defendants violated his Fourth Amendment rights because they fabricated evidence and manufactured probable cause thus causing him to be charged and prosecuted without probable cause.  (Compl. at ¶¶ 57-58.)  In Count II, Plaintiff alleges that Defendant Niehaus violated his Fourth Amendment rights by using excessive, unnecessary, and gratuitous force against him.  (*Id.* at ¶¶ 59-60.)  Finally, in Count III, Plaintiff alleges that Defendant Hamlin, as Defendant Niehaus's supervisor, is liable for violating Plaintiff's Fourth Amendment rights by fabricating evidence and manufacturing probable cause and thus causing Plaintiff to be charged and prosecuted without probable cause.  (*Id.* at 61-63.)

## II.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industries Co. v. Zenith*

---

[1]This action was originally filed by Michael and Terry Tuck against three Defendants; Officer Jeffrey Niehaus, Sergeant Gary Hamlin, and the City of Wixom.  All claims against the City of Wixom have been dismissed with prejudice.  All claims asserted by Plaintiff Michael Tuck against Defendants Niehaus and Hamlin have also been dismissed with prejudice.  *See* 11/23/09 and 11/30/09 stipulated orders of partial dismissal.  The only remaining claims are those asserted by Plaintiff Terry Tuck against Officer Niehaus and Sergeant Hamlin.

*Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

Defendants move for summary judgment arguing that (1) Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claims; (2) probable cause existed for Plaintiff's arrest and prosecution; and (3) Plaintiff cannot state a valid claim for supervisory liability against Sergeant HAMLIN. The Court begins its analysis with Defendants' qualified immunity arguments.

### A.   Qualified Immunity

In a very recent decision, the Sixth Circuit addressed qualified immunity in the context of a § 1983 excessive force case. *See Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009). It began, as this Court does, with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "'government officials performing discretionary functions'" from "'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 309 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). On summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party; Plaintiff in this case. Viewing the facts in that light, the Court must

12

then determine "whether:  1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and citing *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)).  Although the Supreme Court, in *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009), recently held that the courts now have discretion to address the second step first when appropriate, this Court, similar to the Sixth Circuit in *Grawey v. Drury*, will first examine whether Plaintiff has presented evidence of a constitutional violation.  *Grawey*, 567 F.3d at 309.

### 1.  Excessive Force

This Court's task is to evaluate Defendant Niehaus's conduct "under the Fourth Amendment's 'objective reasonableness' standard."  *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)).  Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Determining whether there has been a Fourth Amendment violation requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'"  *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

13

Viewing the facts in the light most favorable to Plaintiff, and applying the above three *Graham* factors, Defendant Niehaus's physical contact with Plaintiff was not objectively reasonable. First, the crime at issue here is not serious -- a 90-day misdemeanor. More importantly, Plaintiff testifies that he did not push, hit, step in front of, or otherwise hinder, obstruct, or threaten Officer Niehaus. Rather, Officer Niehaus charged him, ran into him so hard that it caused him to fall backwards into his son, and nearly knocked him to the ground. Officer Niehaus also grabbed Plaintiff, ripped his shirt, scratched, and bruised him. Prior to this, Plaintiff never heard Officer Niehaus say that either he or his son was under arrest or going to jail. Prior to Officer Niehaus's assault on him, Plaintiff did not verbally or physically resist or hinder an attempt by Officer Niehaus to arrest him or his son. None of these facts would allow a reasonable officer on the scene to conclude that Plaintiff posed an immediate threat to the safety of the officer or others or that Plaintiff was actively resisting arrest or attempting to evade arrest by flight. It is objectively unreasonable to use physical force on a person under these facts. *See Grawley*, 567 F.3d at 311 (holding that an officer uses "excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest."). That Plaintiff did not suffer extensive injury is of no consequence. *See Kostrzewa v. City of Troy*, 247 F.3d 633, 640 n.3 (6th Cir. 2001) (observing that an excessive force claim may be asserted despite the absence of physical marks or extensive physical damage).

Taking the evidence in the light most favorable to Plaintiff but viewing it from the perspective of a reasonable officer on the scene, Plaintiff's evidence establishes an excessive force claim against Defendant Niehaus. Moreover, in light of the decisions

14

discussed above, Plaintiff also satisfies the second step of the qualified immunity analysis by showing that his Fourth Amendment rights were clearly established at the time of Officer Niehaus's physical contact.  "[T]here need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional."  *Grawey*, 567 F.3d at 313-14 (internal quotations marks and citations omitted).  Accordingly, Defendants are not entitled to qualified immunity on this claim, and their motion for summary judgment is denied.  Material issues of fact remain for trial on Plaintiff's excessive force claim.

### 2.  Arrest Without Probable Cause

Plaintiff alleges that his Fourth Amendment rights were violated because he was arrested without probable cause.  It is well-established that "arrest without probable cause violates the Fourth Amendment."  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal quotation marks and citation omitted).  "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge were sufficient 'to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.'"  *Daugherty v. Dickey*, No. 08-CV-11287, 2009 WL 2849118, *4 (E.D. Mich. Aug. 31, 2009) (quoting *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997)).  The Sixth Circuit has observed that generally, in a § 1983 case, "the existence of probable cause" presents a jury question.  *Klein*, 275 F.3d at 550.

Viewing the evidence in a light most favorable to Plaintiff, probable cause did not exist to arrest Plaintiff for violation of the City of Wixom's Criminal Code § 9.08.010.  As discussed above, Plaintiff testified that, prior to entering his home, (1) he was never

15

informed that either he or his son was under arrest, (2) he was never told why Defendant Officers were at his home, and (3) he did not resist, and did not interfere with, facilitate his son's "escape," or otherwise hinder Defendants Niehaus or Hamlin in their attempts to arrest either him or his son.

Moreover, as to Defendant Officers' shouts to Plaintiff, after he and his son were inside their home, to "get his pussy ass out there and go to jail like a man," this Court has observed that the "police cannot, consistent with the Fourth Amendment, manufacture grounds to arrest an innocent person 'by telling him to leave his home without any lawful authority to do so, then arrest him for violating that direction.'"  *Daugherty*, 2009 WL 2849118 at *4 (quoting *Bourgeois v. Strawn*, 501 F. Supp.2d 978, 987 (E.D. Mich. 2007)). In *Bourgeois*, the Court reasoned that, because the police lacked legal authority to enter the plaintiff's home and remove him in the first instance, his refusal to comply with their commands to come out and be arrested could not amount to probable cause to arrest. *Bourgeois*, 501 F. Supp.2d at 987-88.   In a recent decision, the same reasoning was applied under facts similar to those presented here.  *See Daugherty*, 2009 WL 2849118.

In *Daugherty*, the plaintiff arrived home after police were already there.  The police had responded to a 911 call by a neighbor reporting that the plaintiff's sons were in the street fighting with the 911 caller's spouse.  Neighbors had told the police that the plaintiff's sons had gone inside their home, so a police officer instructed the plaintiff to go inside and retrieve her sons.  Plaintiff testified that she complied.  She was yelling her sons' names and looking around the house for them.  She was heading to the basement stairs to look for them.  She saw a police officer in her backyard pointing a handgun at her, and asked

16

him why he was doing so.  She denies she threatened the officer with a gun or any weapon. The officer started yelling at her, ordered her out of the house, and told her that she was under arrest, and ultimately entered the house and tasered her. *Daugherty*, 2009 WL 2849118 at *2.

Similar to here, the police officer's testimony in *Daugherty* provided a different version of the facts.  He testified that he saw the plaintiff inside the house and told her to come out because the police were looking for her son who may be armed.  She swore at him and said, "You wanna gun, I'll show you a fucking gun!"  After that, the officer testified, the plaintiff started to walk down the basement stairs, prompting him to enter the home, yelling to her to "stop."  *Id.*  He tasered her a number of times because she charged at him with her keys above her head "in a threatening manner," did not drop her keys, and struggled with him thus complicating handcuffing.  *Id.*  The plaintiff was arrested and charged with assaulting a police officer.

The district court denied a defense motion for summary judgment, determining that, "[u]nder this scenario, reasonable jurors could conclude that [the police officer] did not have probable cause to arrest" the plaintiff for resisting arrest. *Daugherty*, 2009 WL 2849118 at *5.  "According to [the plaintiff]'s testimony, [the police officer] announced that she was under arrest and shot her with the first taser after [the plaintiff] refused to leave her home by simply remaining on the stairs and questioning [the police officer] as to why she was under arrest."  *Id.* It explained that the plaintiff's profane statement "did not give [the police officer] probable cause to order [the plaintiff] from her home, arrest [the plaintiff], for

resisting arrest . . . , or probable cause to enter [the plaintiff]'s kitchen." *Id.* The same reasoning and result apply here.

According to Plaintiff Terry Tuck's testimony, he did not hear Officer Niehaus say that either he or his son were going to jail or were under arrest before Officer Niehaus charged toward them, running into and grabbing Plaintiff and injuring him. Plaintiff denies that he took action to interfere with or hinder any attempt by Officer Niehaus to arrest either him or his son. Thus, contrary to Defendants' arguments here, *Garner v. Grant*, No. 08-1418, 2009 WL 1391521 (6th Cir. May 15, 2009), is distinguishable. Unlike in *Garner*, if the contested facts are excluded, it cannot be said that probable cause existed to arrest Plaintiff under the City of Wixom's Criminal Code § 9.08.010. Moreover, in light of the decisions discussed above, Plaintiff also satisfies the second step of the qualified immunity analysis by showing that his Fourth Amendment rights were clearly established at the time of his arrest. Accordingly, Defendants are not entitled to qualified immunity on this claim, and their motion for summary judgment is denied. Material issues of fact remain for trial on Plaintiff's Fourth Amendment claim asserting that he was arrested without probable cause.

### 3. Malicious Prosecution - Prosecution Without Probable Cause

Plaintiff also asserts that, because he was prosecuted without probable cause, his Fourth Amendment rights were violated. This type of § 1983 malicious prosecution claim was recently discussed in *Miller v. Tramski*, No. 07-13126, 2009 WL 891729 (E.D. Mich. Mar. 31, 2009). It was observed that in *Wallace v. Kato*, 549 U.S. 384, 390 n.2 (2007), the Supreme Court acknowledged that it has "never explored the contours of a Fourth

18

Amendment malicious-prosecution suit under § 1983" and did not do so in *Wallace*. The Sixth Circuit has also "discussed the confusing state of the law with respect to a § 1983 claim under the Fourth Amendment." *Miller*, 2009 WL 891729 at *11 (discussing *Darrah v. City of Oak Park*, 255 F.3d 301, 308-13 (6th Cir. 2001) and *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005)). In *Darrah*, the Sixth Circuit observed that "if this court finds that there was probable cause to prosecute Darrah, regardless of any alleged false statements made by [the defendant police officer], then she cannot make out a malicious prosecution claim under the Fourth Amendment." *Darrah*, 255 F.3d at 312. In *McKinley*, the Sixth Circuit reiterated that "where there is probable cause to prosecute, a § 1983 action for malicious prosecution will not lie." *McKinley*, 404 F.3d at 445. In a more recent decision, *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007), the Sixth Circuit observed that a § 1983 claim for malicious prosecution "fails when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute." As discussed above, if the contested facts are excluded, it cannot be said that probable cause existed to arrest Plaintiff under the City of Wixom's Criminal Code § 9.08.010. Thus, the Court considers Plaintiff's claim that Defendants influenced the decision to prosecute.

Defendants cite *Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. 2002), and argue that, because there is no evidence that Defendants had any role in influencing the decision to prosecute, they cannot be held liable for a § 1983 malicious prosecution claim. (Defs.' Resp. at 16.) Specifically, Defendants argue that the investigation was turned over to Sergeant Yon, that Detective Mark Bradley investigated the matter, and

19

these two forwarded material to the Wixom City Attorney who made the determination to prosecute Plaintiff.  (*Id.*)

Defendants' reliance on *Skousen* is misplaced.  As the district court observed in *Daugherty*, the *Skousen* Court "found that there was probable cause to arrest and prosecute, and that there was no evidence that the officer had presented untruthful evidence or had testified untruthfully at trial."  *Daugherty*, 2009 WL 2849118 at *7 (citing *Skousen*, 305 F.3d at 528-29)).  Those facts distinguished *Skousen* from the circumstances present in *Daugherty* "where there [was] evidence that the arresting officer lacked probable cause to arrest and caused a criminal prosecution to proceed based on the officer's knowingly false testimony."  *Daugherty*, 2009 WL 2849118 at *7.  The same is true here.  Viewing the facts in the light most favorable to the Plaintiff, Defendant Niehaus deliberately supplied untruthful evidence about his and Plaintiff's conduct on March 15, 2008 and manufactured probable cause.  Just as in *Daugherty*, "[i]t remains reasonably disputed" whether Officer Niehaus's "allegedly false accusations 'caused'" Plaintiff "to be prosecuted." *Id.*  It remains reasonably disputed whether Sergeant Hamlin's allegedly fabricated evidence -- the photograph of  the flashlight, coffee cup and banana -- influenced the City Attorney's credibility determinations concerning Plaintiff's, his son's, the witnesses', and Defendants' versions of the facts, and thus played a role in the decision to prosecute.  Moreover, in light of the decisions discussed above, Plaintiff also satisfies the second step of the qualified immunity analysis by showing that the basis for his § 1983 malicious prosecution claim was clearly established at the time of his arrest and prosecution; i.e., that the police cannot manufacture probable cause or fabricate evidence that may be used to

20

influence a decision to prosecute.  Accordingly, Defendants' motion for summary judgment on Plaintiff's § 1983 malicious prosecution claim is denied.  Material issues of fact remain for trial on Plaintiff's § 1983 malicious prosecution claim.

### B.  Supervisory Liability

Finally, Defendants argue that Sergeant Hamlin cannot be found liable on any of Plaintiff's § 1983 claims under a theory of supervisory liability because he (1) arrived on the scene after Officer Niehaus's alleged use of excessive force; and (2) did not influence the decision to arrest or prosecute.  Plaintiff responds by arguing that Sergeant Hamlin's fabricated evidence -- the photograph of the flashlight, banana, and coffee cup -- was used to encourage or facilitate Officer Niehaus's manufactured probable cause; and thus, he directly participated in Plaintiff's arrest and prosecution without probable cause.

The Sixth Circuit has held "that, even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794, 803 (6th Cir. 2009) (internal quotation marks and citations omitted).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Id*. (internal quotation marks and citation omitted).

Here, it is not disputed that Sergeant Hamlin arrived on the scene after Officer Niehaus's alleged use of excessive force on Plaintiff.  There is no evidence that he implicitly authorized, approved, or knowingly acquiesced in any use of excessive force.  Accordingly, Defendant Hamlin cannot be found liable on that claim under a theory of supervisory

21

liability, and Defendants' motion is granted in favor of Defendant Hamlin on Plaintiff's claim of excessive force.

The same is not true of Plaintiff's Fourth Amendment claims alleging arrest and prosecution without probable cause. Viewing the facts in the light most favorable to Plaintiff, there is evidence that Sergeant Hamlin directly participated in Plaintiff's arrest and prosecution without probable cause. Accordingly, Defendant Hamlin can be found liable on Plaintiff's Fourth Amendment claims alleging arrest and prosecution without probable cause.

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED only as to Plaintiff's § 1983 claim of excessive force against Defendant Hamlin. As to all remaining claims, Defendants' motion is DENIED.



s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge


Dated:  December 22, 2009


I hereby certify that a copy of the foregoing document was served upon counsel of record on December 22, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer_____
Case Manager